UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


L3HARRIS TECHNOLOGIES, INC.,

      Plaintiff,

vs.                                                                CASE NO.


MOOG, INC.,

      Defendant.

_____

### COMPLAINT FOR DAMAGES

Plaintiff L3Harris Technologies, Inc., a Delaware corporation ("L3Harris"), hereby files this action for damages against Defendant Moog, Inc., a New York corporation ("Moog" or "Defendant"), and alleges:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff L3Harris is incorporated in Delaware. L3Harris is authorized to conduct business in Florida, with a principal place of business in Melbourne, Florida. Accordingly, for jurisdictional purposes, L3Harris is a citizen of Delaware and Florida.

2. Defendant Moog is incorporated in New York. It is authorized to conduct business in Florida, but its principal place of business is in Elma, New York. Accordingly, for jurisdictional purposes, Moog is a citizen of New York.

3. The matter in controversy exceeds the value of $75,000.00, exclusive

of interests and costs.

4.    Accordingly, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

5.    This Court has personal jurisdiction over Moog because Moog regularly conducts business in the state of Florida. Moreover, pursuant to the contracts at issue in this Complaint,[1] Moog has explicitly consented to personal jurisdiction in the State of Florida.

6.    Venue is proper in the United States District Court for the Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1391 (b)(2), because a substantial part of the events or omissions giving rise to the present claim occurred in this judicial district.

## GENERAL ALLEGATIONS

7.    L3Harris is a global aerospace and defense contractor, supporting government and commercial customers in more than 100 countries. L3Harris's largest customers are various departments and agencies of the U.S. Government and their prime contractors. L3Harris's products and services have defense and civil government applications, as well as commercial applications.  L3Harris has a business sector dedicated to the designing and building of satellites for U.S. Agencies and commercial customers.

8.    Moog, also a defense contractor, is a worldwide designer, manufacturer, and systems integrator of high performance precision motion and

---

[1]    *See* Article 45 § (b) of the Terms & Conditions discussed in ¶ 14, *infra.*

fluid controls and controls systems for a broad range of applications in aerospace and defense and industrial markets. Moog has a business area dedicated to designing and delivering satellite subsystems and components. Specifically, Moog's wholly owned subsidiary, Moog CSA Engineering, operates as the Vibration Control Business Unit in Moog's Space and Defense Group.

9.      As discussed in more detail below, L3Harris entered into two contracts (the "Prime Contracts") with the U.S. Government, specifically one with the Space Development Agency[2] ("SDA") and another with a U.S. Government customer whose identity is classified (hereinafter the "Saucony Customer").  As further explained in Section A, *infra*, both Prime Contracts were given a special rating by the U.S. Government pursuant to the Defense Priority Allocation System, 15 C.F.R. § 700, requiring delivery of the goods under the Subcontracts to be expedited for national defense purposes.

10.      In the course of its performance of the Prime Contracts, L3Harris entered into four subcontracts with Moog that contemplated the purchase of certain goods and services (the "Subcontracts").

11.      As set forth in more detail below, two of the Subcontracts

---

[2]      SDA is a part of the U.S. Space Force and "contributes to the defense of the United States by designing and rapidly deploying the Proliferated Warfighter Space Architecture, a threat-driven constellation of small satellites that deliver critical services to the United States' warfighters from space." *See Frequently Asked Questions*, SPACE DEVELOPMENT AGENCY, https://www.sda.mil/home/about-us/faq/.

contemplated the purchase from Moog of satellite buses[3] to which payloads[4] being developed and manufactured by L3Harris would attach (the "Bus Subcontracts").

12.     Similarly, the other two Subcontracts contemplated the purchase from Moog of certain hardware and software known as an engineering design unit ("EDU") and a FlatSat, which, together, replicated the satellite buses and allowed for flight-like and orbit-like testing of the payloads in advance of receiving the final flight-ready satellite buses (known as "Flight Buses"). Consistent with industry practice, the overarching purpose of the EDU and the FlatSat is to reduce the satellite delivery schedules of the Prime Contracts by requiring the delivery of functioning replicas of the Flight Buses to enable bus-to-payload integration testing to commence while waiting for the Flight Buses to be delivered.

13.     While each of the Subcontracts were ultimately memorialized by purchase orders executed by both L3Harris and Moog (the "Parties"), the Bus Subcontracts were preceded by letter subcontracts, which are common in the U.S. defense industry. Because of the importance of timely performance under the Prime Contracts, the letter subcontracts contractually authorized Moog to begin its substantive work immediately while certain terms of the underlying agreements were thereafter finalized. Once all terms were finalized (or "definitized," as is used

---

[3]     A satellite bus is the framework that forms the core of a satellite. "It carries and supports the primary systems and subsystems required for the satellites operation, while the payload, which varies depending on the satellite's purpose and mission, is attached to the bus." *See* https://newspaceeconomy.ca/2023/04/01/what-is-a-satellite-bus-and-why-is-it-important/.

[4]     Payloads are developed to perform specific mission functions such as communications, imaging, and navigation while in orbit, whereas the bus is used to carry the payloads in space.

in the defense industry), the letter subcontracts were superseded by purchase orders.

14.     Further, each of the Subcontracts incorporated the same terms and conditions[5] ("T&C"), which were negotiated by the Parties as part of the definitized purchase orders. The T&C provide the method for modification of the Subcontracts and also contain provisions governing delivery and acceptance of goods, delay (including which party bears such associated costs), and breach, among other things.

15.     During the course of performance of the Subcontracts, L3Harris and Moog agreed to a number of amendments or modifications to each Subcontract. These modifications were made via "change orders" executed by both parties. While some change orders were made for administrative purposes, some of the change orders made substantive amendments to the Subcontracts. For instance, some were the result of requests for "engineering change proposals" (or "ECPs") by L3Harris, which resulted in certain augmentations to the scope of work to be performed by Moog.

16.     To that end, Article 12 of the T&C describes the process for "Changes and Equitable Adjustments" to the Subcontracts, and allowed Moog to request, within thirty days of the written request for a change, adjustments to the contract price and/or delivery schedule in response to the changes to scope requested by

---

[5]     While the T&C incorporated by the subcontract known as PO 8486 ("Saucony IRAD"), discussed further below, contains minor differences from the T&C incorporated by the other three Subcontracts, the substantive provisions discussed herein are the same.

L3Harris.

17.     Accordingly, the contract price and delivery schedules contemplated by each Subcontract were indeed modified in response to the agreed-upon change orders thereto.

18.     Ultimately, under each of the Subcontracts, Moog was to deliver goods conforming to the specifications and delivery schedule set forth in the respective Subcontract. Once conforming goods were delivered, the T&C allowed a reasonable period for testing by L3Harris prior to its acceptance or rejection of the applicable goods.

19.     As set forth below, Moog breached each of the Subcontracts by failing to timely deliver the goods contemplated, which has resulted in substantial damages to L3Harris.

20.     Indeed, during the course of performance, L3Harris issued repeated notices and reminders to Moog that time was of the essence as to each Subcontract, and Moog continually reassured L3Harris that it was employing all efforts to minimize delay. L3Harris relied on such reassurances to its own detriment. For instance, among other things, L3Harris assembled and employed teams of individuals with specialized knowledge in preparation to receive and test the promised goods under the Subcontracts. Such individuals were not easily replaceable or re-assignable given the requisite skill set for performance.

21.     Notwithstanding such reassurance, Moog repeatedly missed certain milestone deadlines. By the time it was clear that Moog's continual reassurances

that it would meet performance schedule deadlines were false, L3Harris determined that terminating the Subcontracts with Moog and seeking cover goods was impracticable given L3Harris's deadline to perform under the Prime Contracts and the Government's scheduled launch dates for the buses at issue.

22.    Furthermore, as Moog continued to fall further and further behind schedule, L3Harris devoted significant time and resources to assisting Moog with its efforts to mitigate its own delays because of the urgency of L3Harris's performance under the Prime Contracts. For example, L3Harris sent teams of its own employees to assist Moog at Moog's facilities in Colorado, California, and Arizona, and supported Moog remotely from L3Harris's Palm Bay, Florida facilities. Moreover, L3Harris invested substantial time and resources in assisting Moog with project management, troubleshooting, workarounds, supply-chain management, and design and manufacture of the goods contemplated by the Subcontracts.

23.    Importantly, Article 21 § (b) of the T&C ("Premium Impacts Clause")[6] provides that "[w]hen any delays in delivery occur, Seller encounters difficulty in meeting performance requirements or Seller anticipates difficulty in complying with the delivery schedule or date," the Buyer may request that the Seller use "additional effort, including premium effort, to avoid or minimize delay to the maximum extent possible." Additionally "[a]ll of the costs of the additional effort

---

[6]    The Premium Impacts Clause appears at Article 20 § (b) in the T&C incorporated in the Saucony IRAD Subcontract.

shall be borne by Seller."

24.     L3Harris indeed requested such additional and premium efforts and assisted Moog with those efforts by, among other things, providing personnel and expertise. As a result, all costs associated with these premium and additional efforts are the responsibility of Moog.

25.     Furthermore, Article 10 §§ (a) and (b)(2) of the T&C provide that Seller may withhold any payments in dispute at the time they are due.

26.     As a result of Moog's material breaches of the Subcontracts, L3Harris has incurred substantial damages and costs and has been significantly delayed in its performance under the Prime Contracts.

27.     In addition, Article 25 of the T&C includes an express warranty (the "Express Warranty") that, for 18 months after delivery, Moog guarantees the items delivered under the respective Subcontract "shall be free from defects in material and workmanship [and] will comply with all requirements including specifications, statements of work, drawings, and performance requirements . . . ." *See* Article 25 § (a).

28.     Similarly, the Express Warranty provides a guarantee against latent defects, in which "Buyer's rights to corrective action by Seller . . . commence upon Buyer's discovery of the latent defect and notification of Seller thereof." *See* Article 25 § (c).

29.     The Express Warranty also provides that Moog will, "at its option, repair, correct, or replace at its own cost any such Item which is determined to be

defective . . . ."

30.    As set forth further below, the Satellite Buses are defective in that they do not conform with the specifications set forth in their respective Subcontract.

31.    As a result of Moog's material breaches of the Express Warranty, L3Harris has incurred substantial damages and costs, as further set forth below.

## THE CONTRACTS AND BREACHES AT ISSUE

### A.    SUBCONTRACT PO 4100 ("SAUCONY FLIGHT BUSES")

32.    On July 1, 2020, L3Harris entered into a Contract[7] with the Saucony Customer (the "Saucony Prime Contract").

33.    Under the U.S. Government's Defense Priorities and Allocations Systems ("DPAS") program, the Saucony Prime Contract has a rating of "DX-A2." Consequently, the work under the Saucony Prime Contract is considered to be of the highest national defense urgency, and as such, timely delivery was of utmost importance.

34.    In the course of its performance on the Saucony Prime Contract, L3Harris entered into Letter Subcontract No. A00494100 ("Letter Subcontract 4100") with Moog (d/b/a Moog CSA Engineering).

35.    The agreement under Letter Subcontract 4100 and its progeny are referred to by the project name "Saucony." Letter Subcontract 4100 contemplated the purchase by L3Harris from Moog of two satellite buses by authorizing the

---

[7]    The Saucony Prime Contract was deemed classified in its entirety by the Saucony Customer, which is a U.S. Government entity.

initial design work on the same through design gates known as Preliminary Design Review (or "PDR") and Systems Readiness Review (or "SRR"). The Parties began performance under Letter Subcontract 4100, with the understanding that Letter Subcontract 4100 would ultimately be definitized with a Purchase Order once the final bus design was approved.

36.     Letter Subcontract 4100 was definitized by Purchase Order No. A000494100 ("PO 4100"), Change Order 4, on October 1, 2020. *See* p. 13 of the true and correct copy of PO 4100 and its substantive Change Orders attached as **Exhibit A**.[8] This increased the total contract price to $22,199,638.00. *See* **Exhibit A**, Change Order 4 at p. 7. According to PO 4100, Moog was due to deliver the satellite buses to L3Harris on April 1, 2022 and June 1, 2022, respectively. *See id.*

37.     Overall, the Parties agreed to and executed 17 change orders[9] to PO 4100. As contemplated by Article 12 of the T&C,[10] adjustments were made to the contract price, so that ultimately the contract price totaled $22,403,957.00. *See* **Exhibit A**, Change Order 17 at p. 11.

38.     By December 7, 2021, because of continued schedule slips by Moog relating to Saucony and other Subcontracts (in addition to others not described

---

[8]     Because of the highly sensitive and confidential nature of the contracts at issue, pursuant to M.D. Fla. L.R. 1.11, L3Harris has filed placeholders or redacted versions of certain exhibits. L3Harris will serve unredacted copies on Moog and a file a corresponding Motion to Seal.

[9]     Change Orders 5, 7, 9–10, 13–14, and 17 resulted in substantive amendments to PO 4100.

[10]    *See* Exhibit A at p. 14, Change Order 4, attaching the T&C as "Standard General Provisions – Fixed Price (For Government Programs) and FAR/DFARS Flowdown Provisions."

herein), L3Harris wrote to Moog, providing a detailed outline of "Schedule Delays, Performance Issues and Concerns," and implementing a "Performance Management Corrective Action Request" ("PMCAR"). *See* p. 1 of the true and correct copy of the December 7, 2021, correspondence attached as **Exhibit B**. In the letter, L3Harris explained that Moog's "performance is creating increased cost and risk to L3Harris and eroding Customer confidence in overall execution." *Id.* at 1.

39.    On January 25, 2022, L3Harris again corresponded with Moog, following up on outstanding items from the PMCAR issued on December 7, 2021, writing, "The following items are still outstanding with no closure dates provided and underscore a systemic problem Moog has exhibited with issue mitigation and closure." *See* p. 1 of the true and correct copy of the January 25, 2022, correspondence attached as **Exhibit C**.

40.    On August 12, 2022, L3Harris again corresponded with Moog, setting forth additional failures of Moog to meet certain milestones and requesting that further curative measures be implemented immediately pursuant to the "Premium Impacts" clause under Article 21 § (b) of the T&C. As a result, all costs associated with these premium and additional efforts are the responsibility of Moog. *See* p. 1 of the true and correct copy of the August 12, 2022, correspondence (the "August 12, 2022 Correspondence") attached as **Exhibit D**.

41.    By March 8, 2023, nearly a year after the contracted-for delivery date of the satellite buses, L3Harris corresponded with Moog once more. In that letter,

L3Harris wrote, "[Y]ou have failed to meet the required delivery dates under the Contract and are now projecting delivery no earlier than fifteen months beyond these dates. Based on Moog's latest projected delivery dates, this breach will result in damages, actual to date and forecasted, exceeding twelve million dollars . . . ." *See* p. 1 of the true and correct copy of the March 8, 2023 Correspondence attached as **Exhibit E**.

42.    Notwithstanding, Moog did not ship the satellite buses until May 8 and 11, 2023, respectively—a total of 11 and 13 months after the satellite buses were required to be delivered under the terms of their agreement. Specifically, the buses were shipped with non-conforming software to enable bus-to-payload integration to start because the EDU (further discussed in Section B, *infra*) had not been timely delivered.

43.    As of January 17, 2024, Moog had still not remedied certain non-conformances with PO 4100, and it had yet to complete a number of its other obligations under PO 4100, which were to be completed after the launch of the satellite buses.  However, in order to comply with the timeline for launch under the Saucony Prime Contract, L3Harris needed to allow the satellite buses to enter environmental testing ("EVT").

44.    Because the requirements of PO 4100 had not yet been met by Moog, L3Harris had not yet accepted the satellite buses, and therefore, L3Harris had not yet received title to the satellite buses. Thus, L3Harris requested permission from Moog to allow the satellite buses to begin EVT. Moog, however, declined

L3Harris's request, and instead insisted that the satellite buses remain in place pending L3Harris's acceptance of the satellite buses.

45.     Thus, on January 17, 2024, without any other practicable option that would not compromise the timeline for launch under the Saucony Prime Contract (which was, again, of the highest national defense urgency), L3Harris wrote to Moog, notifying Moog that it accepted the satellite buses, "based on the representations and assurances by Moog that it will complete all of the remaining contract non-conformances and forthcoming (i.e. after launch) obligations" set forth by PO 4100, which L3Harris explicitly identified in an attachment to its correspondence. *See* pp. 1 and 3 of the true and correct copy of the January 17, 2024 correspondence attached as **Exhibit F**.

46.     However, as a result of Moog's significant delay in delivery of the satellite buses and in remedying other non-conformances, constituting a material breach under PO 4100, L3Harris has incurred substantial damages and costs in attempt to minimize the effect of Moog's breaches of the respective Subcontract.

47.     To that end, on February 16, 2024, pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C, L3Harris notified Moog of its intent to withhold the remaining payment of $4,827,202.00 due under PO 4100, which constituted a portion of L3Harris's damages and costs resulting from Moog's breach of PO 4100. *See* p. 1 of the true and correct copy of the February 16, 2024 Correspondence attached as **Exhibit G**. Notwithstanding, L3Harris's damages and costs exceed the payment amount withheld under PO 4100.

**B.    SUBCONTRACT PO 8486 ("SAUCONY EDU")**

48.    In further effort to minimize delay related to Saucony, on July 7, 2020, L3Harris entered into an additional subcontract with Moog (d/b/a Moog CSA Engineering) known as PO A000548486 ("PO 8486").

49.    Under PO 8486, L3Harris purchased an engineering design unit ("EDU") from Moog for the sum of $5,099,857.00.

50.    The agreement under PO 8486 is referred to by the project name "Saucony EDU" or "Saucony IRAD."

51.    An EDU is a flight-like replica of the satellite buses being built under PO 4100, which would provide L3Harris with "flight-like" hardware to allow an early start to integration and testing ("I&T") with the satellite payload (being developed and built by L3Harris).

52.    In other words, L3Harris purchased the EDU so that it could begin testing the payload with the EDU, a replica of the satellite bus that would simulate flight-like conditions. Consistent with industry practice, the intent of purchasing the EDU was to reduce delay at the Prime Contract level by having the ability to test flight payloads on the EDU well before the Flight Buses arrived.  The purpose of doing so was to avoid discovery of technical issues on Flight Buses for the first time in order to have time to react to the discovery and, in turn, avoid significant prime contract schedule and design impacts.

53.    Ultimately, the Parties agreed to 6 change orders, 3 of which resulted

in substantive amendments to PO 8486.[11] A true and correct copy of PO 8486 with its substantive Change Orders is attached as **Exhibit H**.  In accordance with Article 12 of the T&C,[12] the total contract price and the delivery schedule were adjusted accordingly. After all change orders were executed, the contract price totaled $5,099,857.00, and the EDU was to be delivered by January 31, 2022. *See* **Exhibit H** at Change Order 6, pp. 1–2.

54.    Notwithstanding, Moog did not ship the EDU to L3Harris until August 4, 2022, which forced L3Harris to test the payload on the Flight Buses, obviating the purpose of procuring the EDU in the first place. Furthermore, upon receiving the EDU, L3Harris discovered certain deficiencies in the EDU software, resulting in a number of "open software liens" (i.e., non-conformances in the software requiring additional debugging, source code development, and subsequent testing of the software after it is loaded on the EDU to determine it works) that Moog was required to close before the EDU could be deemed to comply with all technical requirements in PO 8486.

55.    In the August 12, 2022 Correspondence, L3Harris requested that further curative measures related to PO 8486 be implemented immediately pursuant to the "Premium Impacts" clause under Article 20 § (b) of the T&C. As a result, all costs associated with these premium and additional efforts are the responsibility of Moog. *See* **Exhibit D** at p. 1.

---

[11]    Change Orders 2, 4, and 6 resulted in substantive amendments to PO 8486.
[12]    *See* Exhibit H at p. 8, PO 8486 attaching the T&C as as "Standard General Provisions – Fixed Price (For Government Programs) and FAR/DFARS Flowdown Provisions."

56. Ultimately, on January 25, 2024, nearly two years after the PO delivery date, the software liens related to the EDU were closed by Moog. Accordingly, on February 13, 2024, L3Harris wrote to Moog and accepted the EDU. *See* p. 1 of the true and correct copy of the February 13, 2024 Correspondence attached as **Exhibit I**.

57. However, as a result of Moog's delay, L3Harris's planned I&T of the payload using the EDU became impossible, forcing L3Harris to perform such testing in real time on the Flight Buses, which in turn caused L3Harris to incur additional unplanned costs (for instance, L3Harris labor to verify requirements) that would otherwise have been avoided but for Moog's delays.

58. Because of Moog's significant delay in delivering the EDU and in remedying other non-conformances, which constituted a material breach under PO 8486, L3Harris has incurred substantial damages and costs in attempt to minimize the effect of Moog's breach.

59. To that end, on February 16, 2024, pursuant to § 672.717, Fla. Stat. and Article 10 §§ 10(a) and 10(b)(2) of the T&C, L3Harris notified Moog of its intent to withhold the remaining payment of $860,496.00 due under PO 8486, which constituted a portion of L3Harris's damages and costs resulting from Moog's breach of PO 8486. *See* **Exhibit G** at 1. Notwithstanding, L3Harris's damages and costs exceed the payment amount withheld under PO 8486.

### C.  SUBCONTRACT PO 8480 ("SDA TRANCHE 0")

60. On October 2, 2020, L3Harris entered into Contract No.

HQ085021c0002 with the Space Development Agency ("Prime Contract 002").

61.     Under the DPAS program, Prime Contract 002 has a rating of "DO-C9." Consequently, the work under Prime Contract 002 is considered a critical priority to national defense.

62.     In the course of its performance on Prime Contract 002, on October 15, 2020, L3Harris entered into Letter Subcontract No. A000568480 ("Letter Subcontract 8480") with Moog (d/b/a Moog CSA Engineering).

63.     The agreement under Letter Subcontract 8480 and its progeny are referred to by the project name "SDA Tranche 0."

64.     Letter Subcontract 8480 contemplated the purchase by L3Harris from Moog of four flight satellite buses.[13] Pursuant to Letter Subcontract 8480, L3Harris agreed to pay to Moog $40,568,317.00, and, in exchange, Moog was to deliver four satellite buses to L3Harris on March 15, 2022, March 29, 2022, April 12, 2022, and April 26, 2022, respectively.

65.     The Parties began performance under Letter Subcontract 8480, with the understanding that Letter Subcontract 8480 would ultimately be definitized with a Purchase Order. Letter Subcontract 8480 authorized Moog immediately to proceed with all efforts necessary for the services required while the final details of the purchase were negotiated.

---

[13]     Initially, the agreement under SDA Tranche 0 also contemplated purchase of a FlatSat. The FlatSat, however, was ultimately transferred to Subcontract PO A000588964 ("SDA Capital"). The FlatSat and the SDA Capital Subcontract are discussed in more detail in Section D, *infra*.

66. Letter Subcontract 8480 was indeed definitized by Purchase Order No. A000568480 ("PO 8480")[14], which the Parties executed on June 30, 2021. As part of the definitization process, the final contract price for PO 8480 became $42,726,741.00. *See* pp. 1 and 6 of the true and correct copy of PO 8480 with its substantive Change Orders attached as **Exhibit J.**

67. During the course of performance of PO 8480, L3Harris and Moog agreed to several Change Orders, 7 of which resulted in substantive amendments to PO 8480.[15]

68. In accordance with Article 12 of the T&C,[16] the total contract price was increased and the performance schedule adjusted accordingly as a result of applicable change orders.

69. For instance, Change Order 7 extended the delivery period to July 26, 2022 for the first bus through September 13, 2022 for the fourth bus. *See* **Exhibit J** at Change Order 7, p. 8–9.

70. Additionally, Change Order 8 extended the delivery period to September 16, 2022 for the first bus through November 4, 2022 for the fourth bus. *See* **Exhibit J** at Change Order 8, p. 9.

71. After all Change Orders were executed, the contract price totaled $44,929,606, and the satellite buses were due to be delivered on September 30,

---

[14]   Change Order 2.
[15]   Change Orders 2–3, 5, 7–8, 11, and 17 resulted in amendments to PO 8480.
[16]   *See* Exhibit J at p. 9, PO 8480 Change Order 2 attaching the T&C as as "Standard General Provisions – Fixed Price (For Government Programs) and FAR/DFARS Flowdown Provisions."

2022, October 21, 2022, November 4, 2022, and November 18, 2022, respectively. *See* **Exhibit J** at Change Order 17, p. 10.

72.  During the course of performance, L3Harris issued numerous instructions and reminders to Moog that time was of the essence.

73.  In its December 7, 2021 correspondence with Moog implementing the PMCAR, L3Harris also addressed its concerns regarding SDA Tranche 0. *See* **Exhibit B** at § 4.

74.  Similarly, L3Harris's follow up on outstanding items from PMCAR in its January 25, 2022 correspondence also addressed items related to SDA Tranche 0. *See* **Exhibit C** at Attachment A.

75.  By November 10, 2022, L3Harris's concerns regarding Moog's performance had continued to escalate, and L3Harris again wrote to Moog, reminding it of the subcontracts urgency and providing that "L3Harris is incurring costs associated with Moog, Inc.'s performance." *See* p. 1 of the true and correct copy of the November 10, 2022 correspondence attached as **Exhibit K**.

76.  By February 14, 2023, nearly 6 months after the first bus was due to be delivered, L3Harris corresponded with Moog once more. In that letter, L3Harris wrote, "[Y]ou have failed to meet the required delivery dates under the Contract and are now projecting delivery no earlier than six months beyond these dates. Based on Moog's latest projected delivery dates, this breach will result in damages, actual to date and forecasted, exceeding twenty million dollars . . . ." *See* p. 1 of the true and correct copy of the February 14, 2023 letter attached as **Exhibit L**.

77.     Notwithstanding, Moog did not ship the satellite buses to L3Harris until May 25, 2023, June 20, 2023,  July 14, 2023, and July 16, 2023, respectively. Specifically, the buses were shipped with non-conforming software to enable bus-to-payload integration to start because the EDU (further discussed in Section D, infra) had not been delivered as promised. This was over a year later than originally contemplated, and 8 months after the deadlines contemplated by the Change Orders. Once received, L3Harris determined the buses were shipped with open software liens reflecting non-compliances with the technical requirements of the respective PO.

78.     As of January 17, 2024, Moog had still not remedied certain non-conformances with PO 8480, and it had yet to complete several of its remaining obligations under PO 8480, which were to be completed after the launch of the satellite buses. However, in order to comply with the timeline for launch under the Prime Contract 002, L3Harris needed to ship the satellite buses to another location for fueling.

79.     Because the requirements of PO 8480 had not yet been met by Moog, L3Harris had not yet accepted the satellite buses, and therefore, L3Harris had not yet received title to the satellite buses. Thus, L3Harris requested permission from Moog to ship the satellite buses to another location for fueling. Moog, however, declined L3Harris's request, and instead insisted that the satellite buses remain in place pending L3Harris's acceptance of the satellite buses.

80.     Thus, on January 17, 2024, without any other practicable option that

would not compromise the timeline for launch under Prime Contract 002 (which was, again, a critical priority to national defense), L3Harris wrote to Moog, notifying Moog that it accepted the satellite buses, "subject to the assurances and expectation [that] Moog will complete the remaining non-conformances and forthcoming obligations (i.e. related to launch)" set forth by PO 8480, which L3Harris explicitly identified in an attachment to its correspondence. A true and correct copy of the January 17, 2024 Correspondence and its attachment is attached as **Exhibit M**.

81.     On February 14, 2024, L3Harris's satellites, which incorporated the Flight Buses manufactured by Moog under PO 8480, were launched into space. Notwithstanding, Moog's obligations under PO 8480 continued after launch, including, among other things, warranty and on-orbit support.

82.     As a result of Moog's significant delay constituting a material breach under PO 8480, L3Harris has incurred substantial damages and costs in attempt to minimize the effect of Moog's breach. Moreover, as L3Harris requested additional and premium efforts under the Premium Impacts Clause, all costs associated with these premium and additional efforts are the responsibility of Moog. *See, e.g.*, **Exhibit B** at p. 6; **Exhibit C** at p. 2.

83.     To that end, on February 16, 2024, pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C, L3Harris notified Moog of its intent to withhold the remaining payment of $11,416,801.00 due under PO 8480, which constituted a portion of L3Harris's damages and costs resulting from Moog's

breach of PO 8480. *See* **Exhibit G**. Notwithstanding, L3Harris's damages and costs exceed the payment amount withheld under PO 8480.

### D.    SUBCONTRACT PO 8964 ("SDA CAPITAL")

84.    In further effort to minimize delay related to SDA Tranche 0, on February 11, 2021, L3Harris entered into an additional subcontract with Moog (d/b/a Moog CSA Engineering) known as PO A000588964 ("PO 8964").

85.    Under PO 8964, L3Harris purchased an EDU and FlatSat from Moog for the sum of $6,647,812.00. The agreement under PO 8964 is referred to by the project name "SDA Capital."

86.    Like an EDU, a FlatSat allows for Guidance Navigation and Control (GNC) testing in flight like conditions. Specifically, the FlatSat allows orbital dynamic simulation, simulating how the satellite  GNC system will perform on orbit.

87.    During the course of performance of PO 8964, L3Harris and Moog agreed to several change orders, 8 of which resulted in substantive amendments to PO 8964. In accordance with Article 12 of the T&C, the total contract price was increased and the performance schedule adjusted accordingly. After all change orders were executed, the contract price totaled $7,700,838.00, and both the EDU and FlatSat were to be delivered on April 22, 2022. A true and correct copy of Change Order 17 to PO 8964, which reflects all substantive changes to PO 8964, is attached as **Exhibit N**.

88.    Notwithstanding, Moog did not ship the EDU to L3Harris until April

14, 2023, or the FlatSat until June 8, 2023. Furthermore, upon receiving the EDU and FlatSat, L3Harris discovered certain deficiencies in the EDU's software, resulting in open software liens.

89.    As the software liens on the EDU remain open, L3Harris wrote to Moog on February 13, 2024, notifying Moog that it accepted the EDU "based on the representation and assurances by Moog that it will complete all of the remaining contract non-conformances and obligations" set forth by PO 8964, which L3Harris explicitly identified in an attachment to its correspondence. A true and correct copy of the February 13, 2024 Correspondence and its attachment is attached as **Exhibit O**.

90.    Separately, Moog remedied certain documentation issues with the FlatSat that had previously precluded acceptance, and, accordingly, L3Harris notified Moog of its acceptance of the FlatSat on February 13, 2024. A true and correct copy of the February 13, 2024 Correspondence is attached as **Exhibit P.**

91.    Notwithstanding, as a result of the delay related to the FlatSat and EDU, L3Harris's I&T was further delayed, and it was required to perform such testing in real time on the SDA Flight Buses.

92.    Because of Moog's significant delay in delivery of the FlatSat and EDU and in remedying other non-conformances, which constituted a material breach under PO 8964, L3Harris has incurred substantial damages and costs in attempt to minimize the effect of Moog's breach. Moreover, as L3Harris requested additional and premium efforts under the Premium Impacts Clause, all costs

associated with these premium and additional efforts are the responsibility of Moog.

93. To that end, on February 16, 2024, pursuant to § 672.717, Fla. Stat. and Article 10 §§ 10(a) and 10(b)(2) of the T&C, L3Harris notified Moog of its intent to withhold the remaining payment of $1,566,8878.00 due under PO 8964, which constituted a portion of L3Harris's damages and costs resulting from Moog's breach of PO 8964. *See* **Exhibit G**. Notwithstanding, L3Harris's damages and costs exceed the price still due under PO 8964.

### E. BREACH OF WARRANTY – SDA SATELLITE BUSES

94. After launch of the SDA Satellite Buses on February 14, 2024, L3Harris discovered substantial defects (the "Defects") in the satellite buses caused by non-conformances with the technical design requirements set forth in PO 8480.

95. These Defects are ongoing and have created the potential for catastrophic loss to the satellites and the SDA mission.

96. On March 11, 2024, and in accordance with Article 25(e) of the T&C (*see* Exhibit J, T&C at p. 7, Article 25), L3Harris wrote to Moog, detailing the catastrophic Defects with the satellite buses and identifying the technical design requirements with which the satellite buses did not comply. A true and correct copy of the March 11, 2024 Correspondence is attached as **Exhibit Q**.

97. Therein, L3Harris requested "Moog's immediate warranty assistance to resolve the noted specification non-conformances." *Id.* at 2. Moog declined, and

instead informed L3Harris it was exhausting the 160 hours of technical time that was included in PO 8480 for general mission support (the "Mission Support") to address the Defects.

98.     To date, the Defects have not been resolved, Moog has exhausted the Mission Support hours, and Moog has failed to comply with its obligations under the Express Warranty provision of the T&C. In addition to the loss of value in the Satellite Buses, L3Harris has incurred significant additional costs and damages in attempt to remedy the defects in the Satellite Buses remotely. This includes, but is not limited to, expenses incurred in deploying L3Harris personnel to assist with a technical solution.

## COUNT I: BREACH OF SUBCONTRACT PO 4100 ("SAUCONY")

99.     L3Harris re-alleges Paragraphs 7–47 as if set forth fully herein.

100.    L3Harris and Moog entered into PO 4100, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

101.    L3Harris has fully performed its obligations under PO 4100 by timely making payments to Moog under PO 4100.

102.    Notwithstanding, Moog has materially breached PO 4100 by failing timely to perform its obligations under PO 4100.

103.    Moog's breach has resulted in substantial damages to L3Harris, namely, costs incurred in attempt to minimize the effect of Moog's breach. These

damages exceed the amounts withheld pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against Moog, Inc. for damages in an amount to be determined and all other relief the Court may deem just and proper.

## COUNT II: BREACH OF SUBCONTRACT PO 8486 ("SAUCONY EDU")

104.   L3Harris re-alleges Paragraphs 7–31 and 48-59 as if set forth fully herein.

105.   L3Harris and Moog entered into PO 8486, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

106.   L3Harris has fully performed its obligations under PO 8486 by timely making payments to Moog under PO 8486.

107.   Notwithstanding, Moog has materially breached PO 8486 by failing timely to perform its obligations under PO 8486.

108.   Moog's breach has resulted in substantial damages to L3Harris, namely, costs incurred in attempt to minimize the effect of Moog's breach. These damages exceed the amounts withheld pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against Moog, Inc. for damages in an amount to be determined and all other relief the

Court may deem just and proper.

## COUNT III: BREACH OF SUBCONTRACT PO 8480
### ("SDA TRANCHE 0")

109.    L3Harris re-alleges Paragraphs 7–31 and 60-83 as if set forth fully herein.

110.    L3Harris and Moog entered into PO 8480, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

111.    L3Harris has fully performed its obligations under PO 8480 by timely making payments to Moog under PO 8480.

112.    Notwithstanding, Moog has materially breached PO 8480 by failing timely to perform its obligations under PO 8480.

113.    Moog's breach has resulted in substantial damages to L3Harris, namely, costs incurred in attempt to minimize the effect of Moog's breach. These damages exceed the amounts withheld pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against Moog, Inc. for damages in an amount to be determined and all other relief the Court may deem just and proper.

## COUNT IV: BREACH OF SUBCONTRACT PO 8964
## ("SDA CAPITAL")

114.    L3Harris re-alleges Paragraphs 7–31 and 84-93 as if set forth fully herein.

115.    L3Harris and Moog entered into PO 8964, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

116.    L3Harris has fully performed its obligations under PO 8964 by timely making payments to Moog under PO 8964

117.    Notwithstanding, Moog has materially breached PO 8964 by failing timely to perform its obligations under PO 8964.

118.    Moog's breach has resulted in substantial damages to L3Harris, namely, costs incurred in attempt to minimize the effect of Moog's breach. These damages exceed the amounts withheld pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against Moog, Inc. for damages in an amount to be determined and all other relief the Court may deem just and proper.

## COUNT V: BREACH OF EXPRESS WARRANTY  IN SUBCONTRACT PO 8480
## ("SDA TRANCHE 0")

119.    L3Harris re-alleges Paragraphs 7–31, 60-83, and 94-98 as if set forth fully herein.

120.    L3Harris and Moog entered into PO 8480, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

121.    L3Harris has fully performed its obligations under PO 8480 by timely making payments to Moog under PO 8480.

122.    PO 8480 contains an express warranty in Article 25 § (a) of the T&C.

123.    Moog breached the express warranty by providing satellite buses (i.e. goods) that do not conform with the technical specifications set forth in PO 8480.

124.    On March 11, 2024, L3Harris notified Moog of its breach of the express warranty and requested Moog's immediate warranty assistance.

125.    Notwithstanding, Moog has failed to comply with its obligations to remedy the breach of express warranty.

126.    Moog's breach has resulted in substantial damages to L3Harris, including, but not limited to, loss of value of the goods and costs incurred in attempt to minimize the effect of Moog's breach. These damages exceed the amounts withheld pursuant to § 672.717, *Fla. Stat.* and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against

Moog, Inc. for damages in an amount to be determined and all other relief the Court may deem just and proper.

## COUNT VI: BREACH OF EXPRESS WARRANTY  IN SUBCONTRACT PO 8480 (LATENT DEFECTS) ("SDA TRANCHE 0")

127.    L3Harris re-alleges Paragraphs 7–31, 60-83, and 94-98 as if set forth fully herein.

128.    L3Harris and Moog entered into PO 8480, which is a valid and binding agreement contemplating payment by L3Harris for goods manufactured by Moog.

129.    L3Harris has fully performed its obligations under PO 8480 by timely making payments to Moog under PO 8480.

130.    PO 8480 contains an express warranty against latent defects in Article 25 § (c) of the T&C.

131.    Moog breached the express warranty by providing satellite buses (i.e. goods) that contained latent defects in that they do not conform with the technical specifications set forth in PO 8480.

132.    On March 11, 2024, L3Harris notified Moog of its breach of the express warranty and requested Moog's immediate warranty assistance.

133.    Notwithstanding, Moog has failed to comply with its obligations to remedy the breach of express warranty.

134.    Moog's breach has resulted in substantial damages to L3Harris, including, but not limited to, loss of value of the goods and costs incurred in

attempt to minimize the effect of Moog's breach. These damages exceed the amounts withheld pursuant to § 672.717, Fla. Stat. and Article 10 §§ 10(a) and 10(b)(2) of the T&C.

WHEREFORE, L3Harris Technologies, Inc. demands judgment against Moog, Inc. for damages in an amount to be determined and all other relief the Court may deem just and proper.

Dated this 28th day of March, 2024.

/s/ Suzanne E. Gilbert
Suzanne E. Gilbert, Esq.
Fla. Bar No. 94048
Kristin N. Royal, Esq.
Fla. Bar No. 0125734
HOLLAND & KNIGHT, LLP
200 South Orange Avenue
Suite 2600
Orlando, FL 32801
Telephone: (407) 425-8500
Facsimile: (407) 244-5288
suzanne.gilbert@hklaw.com
kristin.royal@hklaw.com
Counsel for L3Harris Technologies, Inc.